UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KERRI SPARKS,

Plaintiff,

v.

HENRY FORD HEALTH
SYSTEM et al.,

Defendants.

Case No. 21-11430
Honorable Shalina D. Kumar
Magistrate Judge Anthony P. Patti

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 37) AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 38)**

---

## I.    Introduction

Plaintiff Kerri Sparks sues defendants Henry Ford Health System and Henry Ford Allegiance Health for alleged disability discrimination in violation of the Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18116, and the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), M.C.L. § 37.1301 *et seq*. ECF No. 29.

The parties move for summary judgment. ECF Nos. 37, 38. Their motions have been fully briefed, and the Court heard oral argument on January 31, 2024. ECF Nos. 37, 38, 41, 43, 45, 47. This matter is now ripe

for decision. For the reasons below, the Court grants in part and denies in part defendants' motion and denies plaintiff's motion.

## II.    Factual Background

Sparks is deaf and communicates in both American Sign Language (ASL) and by lip reading. ECF No. 38-2, PageID.527, 530. The parties dispute whether ASL or lip reading is her primary mode of communication: Sparks testified that she "[is] an ASL user" who relies on ASL at church, with her attorney, and on video calls. *Id.* at PageID.530, 542, 545-46. But she also testified that she communicates through lip reading with her long-term boyfriend, David Kirkland, and her family. ECF No. 37-4, PageID.378-80, 403. At Sparks' previous jobs, she communicated in ASL with her coworkers who could do the same but in writing and through lip reading with those who could not. *Id.* at PageID.380-81.

Sparks is a frequent patient at defendant Henry Ford Allegiance Health hospital (the "hospital"). ECF No. 38-2, PageID.578-80. The hospital is part of defendant Henry Ford Health System, which provides information for the hospital's staff on who constitutes a qualified interpreter, the procedure for requesting an interpreter or other auxiliary aid, and what to do when no qualified interpreter is available. *Id.* at PageID.579; ECF No. 38-7. As noted in defendants' policy, defendants provide 24/7 aids and

services, including qualified interpreters, to people with disabilities so that they can communicate effectively during medical treatment, and if a patient believes that defendants have failed to provide such services, defendants' policy notes that staff should consult the patient and various factors to determine what steps to take to enable communication with the patient. ECF No. 38-7, PageID.996-97.

In November 2020, with the aid of an ASL interpreter, Sparks met with her doctor, Amritraj Loganathan, to discuss her upcoming spinal fusion surgery at the hospital. ECF No. 22-3, PageID.153-57. At that appointment, Sparks requested that defendants provide an in-person ASL interpreter for her during a surgery education class scheduled for December 1, 2020. ECF No. 38-2, PageID.590. Defendants in turn submitted a request to a third-party service to have an ASL interpreter present at the class. ECF No. 22-4, PageID.184. Because of an unintentional clerical error, defendants did not process the ASL interpreter request until November 30, 2020, the day before the class. *See* ECF No. 22-4, PageID.184; ECF No. 38-6, PageID.940-41; ECF No. 38-9.

On December 1, 2020, Sparks attended the class with Kirkland and asked for her interpreter. ECF No. 38-2, PageID.593-96. However, an interpreter did not show up, and defendants' staff deployed a Video

Remote Interpreter (VRI)—an internet-connected tablet that allows an interpreter to appear remotely. ECF No. 37-5, PageID.431-33; *see* ECF No. 38-2, PageID.596. The VRI failed to work properly due to connection issues, and defendants' staff removed it from the class before the class began. ECF No. 38-2, PageID.578, 594; ECF No. 38-4, PageID.789.

Without an in-person interpreter or VRI, at the beginning of the class Sparks received a printout of the information covered in the class and asked the class's instructor, Jamie Harness, to wear a clear face shield so that Sparks could lip read. ECF No. 37-5, PageID.433; ECF No. 37-4, PageID.396-97, 400. Sparks sat in the front row of the class, and Harness proceeded to conduct the class while wearing a clear face shield and facing towards Sparks to allow for lip reading. ECF No. 22-5, PageID.188-189; ECF No. 37-5, PageID.433, 436-37. According to Harness, after she started teaching the class, Sparks did not ask for an in-person interpreter, ask any questions, or signal that she did not understand the information. ECF No. 22-5, PageID.190.

But Sparks testified that, during the class, she was "sitting there not understanding what they're saying . . . ." ECF No. 38-2, PageID.602. Sparks explained that she did not object during the class because she "was extremely upset by that time and understood there was just no way there

was going to be communication with [Harness]." ECF No. 38-2,

PageID.613. She tried using an old hearing aid, which allowed her to hear

that people were talking but not what they said. *Id.* at PageID.577-78, 601.

Sparks testified that she did not completely understand the handout, that

she needed an interpreter to understand the surgery and its risks, and

"without an interpreter, [she] didn't understand anything." *Id.* at PageID.598,

615.

On January 8, Sparks met again with Dr. Loganathan for a pre-

operation appointment, during which defendants provided an in-person

interpreter. *Id.* at PageID.618-22. With the interpreter's aid during the

meeting, Sparks discussed directly with Dr. Loganathan the surgery, its

risks and benefits, and her recovery. *Id.*

On January 14, 2021, Sparks had her spinal fusion surgery. *Id.* at

PageID.623. Sparks arrived at the hospital with Kirkland, met with a nurse,

and asked for an interpreter. ECF No. 22-3, PageID.166. The nurse told

Sparks that an interpreter would arrive soon. *Id.* at PageID.166. Despite

Sparks' prior request to have an interpreter for the surgery and in turn

defendants' interpreter request on Sparks' behalf to a third party,

defendants did not have an interpreter present for Sparks. ECF No. 38-8,

PageID.1007; ECF Nos. 38-10, 38-11.

After Sparks learned that there would be no interpreter, she discussed having the staff wear clear face shields to allow for lip reading. ECF No. 22-3, PageID.166-67. But over Sparks' objection that Kirkland was not fluent in ASL, the staff had Kirkland interpret for Sparks before Sparks underwent her surgery. ECF No. 22-3, PageID.167-68. Sparks' testimony indicates that at times during this appointment she was unable to understand the medical staff or their answers to her questions. *Id.* at PageID.166-72. However, she also testified that she repeatedly asked staff for an interpreter throughout the surgery appointment, and without a qualified ASL interpreter, she "was confused because there was no communication" and that she "had no idea what [the staff members] were saying." ECF No. 38-2, PageID.645; *id.* at PageID. 626-27, 630-32; ECF No. 38-3, PageID.686. She further testified that she declined to stay another night at the hospital because she could not communicate with the staff. ECF No. 38-2, PageID.623.

After her surgery, Sparks received and could understand an informational handout about her recovery. ECF No. 37-4, PageID.404. Sparks testified that because she did not have an interpreter for her surgery, she experienced frustration, anxiety, and distress during and after

Page **6** of **21**

the surgery . ECF No. 38-2, PageID.569-70, 632; ECF No. 38-3,

PageID.686, 708-09.

## III.    Standard of Review

When a party files a motion for summary judgment, it must be

granted "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The standard for determining whether summary

judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *State Farm Fire & Cas. Co.*

*v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

Where the movant establishes the lack of a genuine issue of material

fact, the burden of demonstrating the existence of such an issue shifts to

the non-moving party to come forward with "specific facts showing that

there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322–23 (1986). That is, the party opposing a motion for summary judgment

must make an affirmative showing with proper evidence and must

"designate specific facts in affidavits, depositions, or other factual material

showing 'evidence on which the jury could reasonably find for the [non-

movant].'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (E.D. Mich. 2004). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

"When, as here, there are cross-motions for summary judgment, the Court considers them separately, and it is not necessary that either party is entitled to summary judgment; it is possible that neither party meets its burden." *Peatross v. Liberty Mutual Personal Ins. Co.*, 575 F. Supp. 3d 887, 891 (E.D. Mich. 2021) (citing *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021)). When considering the plaintiff's motion, the evidence is viewed in the light most favorable to defendant, all reasonable inferences must be drawn in favor of defendant, and the burden is on the plaintiff to show that she is entitled to judgment as a matter of law. *Id*. The opposite is true when considering the defendant's motion. *Id*.

## IV.   Analysis

### A. Liability

Both parties seek summary judgment on the issue of liability for Sparks' ACA and PWDCRA claims. Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited under . . . [§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,] be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ." 42 U.S.C. § 18116(a); *Doe v. BlueCross BlueShield of Tenn.*, Inc., 926 F.3d 235, 238 (6th Cir. 2019).

In turn, § 504 of the Rehabilitation Act prohibits covered programs from denying benefits to or discriminating against individuals "solely by reason of her or his disability." 29 U.S.C. § 794(a). Violations of the Rehabilitation Act occur when a hospital "fails to provide appropriate auxiliary aids and services to a deaf patient, or a patient's deaf companion, where necessary to ensure effective communication." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017) (cleaned up).

The PWDCRA also prohibits discrimination on the basis of one's disability, and courts routinely analyze PWDCRA claims using the same framework as the ACA. *See Rose v. Wayne Cnty. Airport Auth.*, 210 F. Supp. 3d 870, 883 (E.D. Mich. 2016).

Likewise, courts generally analyze ACA and Rehabilitation Act claims in the same manner, *see id.*, but the regulations implementing each statute differ in important ways. *Tomei v. Parkwest Med. Ctr.*, 24 F.4th 508, 513 (6th Cir. 2022); *Nieves v. Plaza Rehab. & Nursing Ctr.*, 2023 WL 4763945, at *10 (S.D.N.Y. July 26, 2023). As relevant here, unlike the regulations

under the Rehabilitation Act, the ACA's implementing regulations provide

that an entity operating covered health programs or activities "shall take

appropriate steps to ensure that communications with individuals with

disabilities are as effective as communications with others in such

programs or activities, in accordance with" certain regulations implementing

the Americans with Disabilities Act (ADA). 45 C.F.R. § 952.102(a); *see*

*Tomei*, 24 F.4th at 513; *Nieves*, 2023 WL 4763945, at *10.

Under those ADA regulations, "a covered entity must 'give primary

consideration to the requests of individuals with disabilities' when

'determining what types of auxiliary aids and services are necessary.'"

*Nieves*, 2023 WL 4763945, at *10 (quoting *Fantasia v. Rochelle*, , 2022 WL

294078, at *8 (S.D.N.Y. Feb. 1, 2022)); *see also Tomei*, 24 F.4th at 513

(stating that ACA-covered entities "must defer to the individual's request" of

aid). "Primary consideration" means a covered "entity must 'honor the

person's choice, unless it can demonstrate that another equally effective

means of communication is available, or that the use of the means chosen

would result in a fundamental alteration or in an undue burden.'" *Vega-Ruiz*

*v. Northwell Health*, 992 F.3d 61, 65 (2d Cir. 2021). If there are material

facts in dispute as to "whether Defendants gave primary consideration to

Plaintiff's requested auxiliary aid, whether Defendants otherwise provided

another equally effective means of communication, or whether the requested aid created an undue financial burden," summary judgment is inappropriate. *Nieves*, 2023 WL 4763945, at \*10; *see, e.g.*, *Parker v. William Beaumont Hosp.*, No. 20-12475, 2023 WL 3606653, at \*10 (E.D. Mich. May 23, 2023).

Even if, as Sparks argues, defendants failed to give primary consideration to Sparks' requests for ASL interpreters, summary judgment for the defense may nonetheless be appropriate if defendants otherwise provided an equally effective means of communication.[1] That is the dispositive issue,[2] and it requires the Court to examine "whether the hospital provided the kind of auxiliary aid necessary to ensure that a deaf

---

[1] Sparks argues as a separate basis of liability that defendants "treated Sparks differently than other patients." ECF No. 38, PageID.503. She bases her argument on the ADA, but the ADA is "analyzed under the same legal framework" as claims under the Rehabilitation Act and, by extension, the ACA. *Tokmenko v. Metrohealth Sys.*, 488 F. Supp. 3d 571, 577 (N.D. Ohio 2020). In this context, courts have rejected similar "treated differently" theories because at bottom the inquiry is whether the defendant provided an equally effective means of communication. *See, e.g.*, *Hejmej v. Peconic Bay Med. Ctr.*, 2023 WL 4373628, at \*3 (E.D.N.Y. July 6, 2023). Sparks does not explain or provide any authority as to why her "treated differently" theory calls for a different legal framework than the one above. Without more, the Court need not consider Sparks' "treated differently" theory. *See id.*; *see also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

[2] The parties do not dispute that Sparks' requests for in-person interpreters imposed no undue burdens.

patient was not impaired in exchanging medically relevant information with hospital staff." *Silva*, 856 F.3d at 835. The patient must not have experienced a "real hindrance, because of her disability," affecting her ability to exchange material medical information with hospital staff. *Id.*

"Available auxiliary aids for deaf individuals include qualified in-person interpreters, VRI, computer-aided transcription services, written materials, and the exchange of handwritten notes." *Tokmenko v. Metrohealth Sys.*, 488 F. Supp. 3d 571, 578 (N.D. Ohio 2020). "[T]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with" several context-specific factors, including the "nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Silva*, 865 F.3d at 835. Determining whether a hospital has provided appropriate auxiliary aids where necessary is inherently fact-intensive and often precludes summary judgment. *Id.*

Here, for the surgery education class, it is undisputed that defendants did not have an interpreter or a properly functioning VRI for Sparks. But the evidence conflicts as to what extent Sparks needed those forms of communicating to allow an unimpaired exchange of material information for the class. For example, defendants point to evidence showing that Sparks

received a printout of the information covered in the class; that upon

Sparks' request, the instructor taught the class while wearing a clear face

shield to allow Sparks to lip read, which is Sparks' primary way of

communicating with people who cannot communicate in ASL; and that

Sparks gave no indication during the class that she did not understand

anything. ECF No. 37-4, PageID.379-81, 396-97; ECF No. 22-5,

PageID.190. However, Sparks testified that she could not understand what

was said, did not fully understand the printout she received, and even tried

to use an old hearing aid to no avail. ECF No. 38-2, PageID.577-78, 615.

Sparks further testified that she needed an interpreter "to know more

specific information about the risk . . . . And without an interpreter, I didn't

understand anything [during the class]." *Id.* at PageID.598; *see also id.* at

PageID.602 ("I'm sitting there [at the class] not understanding what they're

saying . . . ."). Based on the evidence, reasonable jurors may disagree as

to whether Sparks required an in-person interpreter or VRI to ensure

effective communication for the class.

　　As for the surgery appointment, it is also undisputed that defendants

did not have an interpreter or a VRI but that defendants had Sparks'

boyfriend communicate with Sparks. Defendants point to evidence that

Sparks had two prior meetings with her surgeon and in-person ASL

interpreters to fully discuss the surgery; that her boyfriend, with whom she has communicated for twelve years without an interpreter and primarily through lip reading, allowed for communication during the appointment; and that after her surgery, Sparks received a comprehensible handout about her recovery. ECF. No. 22-3, PageID.153-57, 166-172; ECF No. 37-4, PageID.401-04; ECF No. 38-3, PageID.711. When viewed in the light most favorable to defendants, defendants' evidence suggests that the level of communication at the appointment was sufficient given the totality of the circumstances. Sparks' testimony, however, indicates that without an interpreter, she could not know what was happening at the time, and after her surgery, she declined to stay another night at the hospital because she could not communicate with hospital staff. ECF No. 38-2, PageID.623, 645; ECF No. 38-3, PageID.686. The parties' evidence, therefore, presents genuine issues as to whether the hospital provided the auxiliary aid necessary to ensure effective communication for the surgery.

Because the evidence is not "so one-sided that [either Sparks or defendants] must prevail as a matter of law," neither party is entitled to summary judgment on Sparks' claims. *See McGowan*, 421 F.3d at 436.

**B. Entitlement to Relief**

Defendants seek summary judgment on Sparks' requests for declaratory and injunctive relief, compensatory damages, nominal damages, and attorney fees. In response, Sparks withdraws her request for declaratory and injunctive relief. ECF No. 43, PageID.2352. The Court analyzes defendants' remaining challenges to Sparks' requested relief in turn.

Defendants argue that Sparks cannot show entitlement to compensatory damages. To recover compensatory damages on her ACA claim, Sparks must show that defendants intentionally discriminated against her. *See Hill v. Bradley Cnty. Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008); *Tucker v. Tennessee*, 443 F. Supp. 2d 971, 973 (W.D. Tenn. 2006), *aff'd*, 539 F.3d 526 (6th Cir. 2008). Because the legal standards for her PWDCRA claim substantially mirror her ACA claim, Sparks must also show intentional discrimination to recover compensatory damages on her PWDCRA claim. *See Harris v. Port Huron Charter Twp.*, No. 14-CV-13453, 2015 WL 5439744, at *5 (E.D. Mich. Sept. 15, 2015) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012)).

For purposes of her ACA and PWDCRA claims, Sparks may prove that defendants engaged in intentional discrimination by showing that

defendants acted with deliberate indifference. *R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cnty., Ky.*, 637 F. App'x 922, 925 (6th Cir. 2016) (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Duvall*, 260 F.3d at 1139.

In this context, deliberate indifference requires that "[a]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). An official's failure to adequately respond to alleged discrimination "must be a 'deliberate choice[,]' rather than negligence or bureaucratic inaction" to amount to deliberate indifference. *Id.* at 276 (citation omitted).

An official need not have "'substantial supervisory authority' within an organization"—instead, the official must be someone with some "discretion at a 'key decision point' in the administrative process." *Biondo v. Kaledia Health*, 935 F.3d 68, 76 (2d Cir. 2019) (quoting *Liese v. Indian River Cnty.*

*Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012)). Courts have applied this requirement to include nurses and hospital staff who have authority to take corrective measures. *See, e.g.*, *id.* at 75; *Loeffler*, 582 F.3d at 276; *Tokmenko*, 488 F. Supp. 3d at 581; *Tomei v. Parkwest Med. Ctr.*, No. 3:19-cv-41, 2022 WL 703656, at *6 (E.D. Tenn. Mar. 8, 2022).

Viewing matters in the light most favorable to Sparks, the record indicates that during the surgery appointment, the hospital staff had actual knowledge of a potential ACA violation, had authority to take corrective measures, and failed to respond adequately. The staff had actual knowledge of the potential ineffective communication with Sparks absent an interpreter because Sparks requested an interpreter for her surgery before her surgery date and repeated her request to the staff multiple times after she arrived for her surgery, with one nurse even assuring her that an interpreter would arrive. ECF No. 38-2, PageID.571, 626-27, 631-33.

That nurse, and other staff, had authority to correct the potential ineffective communication because defendants' policy empowers them to do so. Staff took steps such as deploying a VRI and wearing a face shield to prevent communication issues during the surgery education class, and staff tried to do similarly for the surgery appointment by discussing

workarounds with Sparks. *See Biondo*, 935 F.3d at 75; ECF No. 38-7; ECF No. 37-5, PageID.431-37; ECF No. 38-2, PageID.630-32.

Last, the nurse and other staff failed to respond adequately to Sparks' concerns when they failed to offer to deploy a VRI, declined to wear face shields to allow lip reading, and ultimately chose to use Sparks' boyfriend as a stand-in interpreter despite Sparks' objection that he is not fluent in ASL. ECF No. 38-2, PageID.631. As the Court concludes above, the evidence would allow a reasonable jury to find that the level of communication during the surgery appointment fell short of the level required to ensure effective communication. As such, the evidence would also allow a reasonable jury to find deliberate indifference, as well as intentional discrimination and entitlement to compensatory damages by extension.

Although Sparks shows evidence of intentional discrimination allowing her to pursue compensatory damages, she may not pursue compensatory damages for emotional distress. Despite Sparks' arguments to the contrary, the Supreme Court has expressly held that compensatory emotional distress damages are not recoverable under the Rehabilitation Act and the ACA. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 222, *reh'g denied*, 142 S. Ct. 2853 (2022). Under *Cummings*, Sparks

may not pursue emotional distress damages as part of the compensatory damages that may otherwise be available to her.[3] *See id.* Accordingly, defendants are entitled to summary judgment in their favor as to the unavailability of compensatory emotional distress damages but not as to the availability of other compensatory damages.

Defendants next argue that Sparks is not entitled to recover nominal damages because, as with compensatory damages, she does not show intentional discrimination. But their argument fails. As the Court concludes above, a reasonable jury could find intentional discrimination.

Further, defendants do not offer binding or persuasive authority to support their argument. Rather, as Sparks suggests, "remedies traditionally available in suits for breach of contract" are appropriate to redress ACA violations. *Id.* at 226. In contract actions, "if a plaintiff cannot show actual damages flowing from the breach of contract, she is entitled to nominal damages." *Nieves*, 2023 WL 4763945, at *10. Thus, for plaintiffs not entitled to recover compensatory damages for ACA violations, courts have

---

[3] Sparks also argues that *Cummings* should not be applied retroactively. However, "[w]hen [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule." *Harper v. VA Dep't of Tax'n*, 509 U.S. 86, 97 (1993).

held that such plaintiffs are still entitled to recover nominal damages. *See id.* (listing cases). If Sparks cannot show entitlement to compensatory damages for her claim at trial, Sparks may still pursue nominal damages. Accordingly, defendants are not entitled to summary judgment in their favor as to the availability of nominal damages.

Defendants last argue that Sparks is not entitled to recover attorney fees. In order for a plaintiff to receive attorneys' fees in a civil rights action, the plaintiff must be the prevailing party. 42 U.S.C. § 12205. "Prevailing party" means that the plaintiff "succeed[s] on a[] significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Usually, a "civil rights plaintiff is not entitled to attorney's fees when all that he has won is a technical vindication of rights in the form of nominal damages." *Pouillon v. Little*, 326 F.3d 713, 717 (6th Cir. 2003) (citing *Farrar v. Hobby*, 506 U.S. 103, 115 (1992)).

Here, defendants merely assert that Sparks "is not entitled to an award of attorney fees because she is not a prevailing party." ECF No. 37, PageID.347. Defendants fail to address whether Sparks would achieve some of the benefit she sought in bringing this action if she were to show intentional discrimination and entitlement to compensatory damages at trial.

If she were to do so, Sparks may win more than just nominal damages and may be able to receive attorney fees as a result. Accordingly, defendants are not entitled to summary judgment as to the unavailability of attorney fees for Sparks' claims.

## V.     Conclusion

For the reasons above, defendants' motion for summary judgment is (ECF No. 37) is **GRANTED IN PART** and **DENIED IN PART** and Sparks' motion for partial summary judgment (ECF No. 38) is **DENIED**. The Court **DISMISSES** Sparks' claims for declaratory and injunctive relief. At trial, Sparks may not pursue compensatory emotional distress damages but may pursue other compensatory damages, as well as nominal damages and attorney fees, on her ACA and PWDCRA claims.

s/ Shalina D. Kumar<br>
SHALINA D. KUMAR<br>
United States District Judge

Dated: March 21, 2024